Hart, J.,
dissenting. It is with regret that I am unable to concur with the majority in this ease. My deeply conscientious opinion is that the distribution of these funds derived from public taxation as here proposed constitutes the laying of a private hand upon public funds and a threat to the integrity of government.
■ It may be conceded that the funds in question are public funds and must be expended for a public purpose. 42 American Jurisprudence, 756, Section 57, and cases cited. And “public purpose” is synonymous with “governmental purpose.” Stanley v. Jeffries, Treas., 86 Mont., 114, 284 P., 134, 70 A. L. R., 166; Veterans of Foreign Wars v. Childers, Aud., 197 Okla., 331, 171 P. (2d), 618. It may be conceded also that the veterans organizations to which the appropriations in question were made are private corporations and not governmental entities. See State v. Johnson, 170 Wis., 218, 175 N. W., 589, 594, 7 A. L. R., 1617.
A fundamental question then arises. May public funds derived from public taxation be appropriated to private in *156 strumentalities not by way of payment of a private debt but for expenditure by them for the benefit of their own members, however laudable such expenditure may be?
In the early case of Auditor of Lucas County v. State, ex rel. Boyles, 75 Ohio St., 114, 78 N. E., 955, 7 L. R. A. (N. S.), 1196, this court held:
“The act entitled ‘An act to provide relief for worthy blind,’ *' * * which provides that all male blind persons over the age of 21 years, and all female blind persons over the age of 18 years, who have been residents of the state for five years and of the county for one year and have no property or means with which to support themselves, shall be entitled to and receive not more than 25 dollars per capita quarterly from the county treasury, is unconstitutional for the reason that it requires the expenditure for a private purpose of public funds raised by taxation.”
In that case, Judge Summers said:
“The care of the state for its dependent classes is considered by all enlightened people as a measure of its civilization and it is not doubted that the legislation under consideration was inspired by beneficent if not enlightened motives. This state has provided institutions for the education of the blind; for feebleminded youth; for honorably discharged soldiers, sailors and marines; a home for soldiers ’ and sailors ’ orphans; for the care and treatment of the insane; an asylum for epileptics and epileptic insane; a boys’ industrial school; a girls’ industrial home; for the establishment of homes of the friendless; a sanitarium for consumptives; and an institution for the treatment and education of deformed and crippled children. The object of these institutions is sufficiently indicated by their designation, and may be stated to be, generally, to provide places and means where their afflictions may be relieved, or where they may be taught and trained so that they may be self-supporting, or less likely to become a burden on the state, or where their physical wants may be supplied at the public expense. But it does not follow that it would be either wise or constitutional to select out a class, having some particular physical infirmity, and then confer a bounty upon individuals of that class. If a bounty may be conferred upon individuals of one *157 class, then it may be upon individuals of another class, and if upon two, then upon all. And if upon those who have physical infirmities, then why not upon other classes who for various reasons may be unable to support themselves? And if these things may be done, why may not all property be distributed by the state?
4 4 * # *
* Tbe act does not direct that the payments shall continue during the lifetime of the beneficiary, nor does it limit the time, nor provide that payments shall cease with the needs of the donee, or provide for any subsequent inquiry. It is an indeterminate gratuitous annuity, a gift pure and simple, and, being so, the Legislature is without authority to make it from the public funds. Other provisions of the act are open to criticism, but as they go to the wisdom of the legislation rather than to the power to enact it, they will not be noticed.
“It may be said that funds used for the care of the poor are used for a public purpose, and that moneys used under the provisions of this act will subserve a public purpose for the reason that they will enable many blind persons, aided by their own efforts or those of their friends, to support themselves, and thus to escape becoming a public charge. The wisdom of the legislation is not questioned: the power of the Legislature to so enact is the question presented here, and that an incidental public benefit is not sufficient to save the legislation has also been decided in the case just referred to [Loan Assn. v. Topeka, 20 Wallace, 655].”
There are certain cases where the appropriations of public funds were made for the erection of soldiers monuments, memorial buildings and the like to symbolize the soldier’s spirit of sacrifice and to stimulate patriotism, and such expenditures have been approved by the courts. But it will be noted that such structures are not given away to private persons. Title and possession remain in the state or county erecting them or in the public trustees for the governmental unit erecting them, and they remain available for the use and enjoyment of all the members of the public on the same basis. Cases of this type are People v. Westchester County Natl. Bank, 231 N. Y., 465, 132 N. E., 241, 15 A. L. R., 1344; Opinion of the Jus *158 tices to the Senate, 211 Mass., 608, 98 N. E., 338; Barrow v. Bradley, Mayor, 190 Ky., 480, 227 S. W., 1016; Hill v. Roberts, Governor, 142 Tenn., 215, 217 S. W., 826. And courts generally frown upon such construction for the exclusive use of army posts or private soldiers organizations, since they are not public bodies or is their use of such construction a public one. Kingman v. City of Brockton, 153 Mass., 255, 26 N. E., 998, 11 L. R. A., 123.
The record discloses that all the defendant organizations have a limited membership of private persons, membership being controlled by the organizations themselves, and admission thereto being by the approval of the organization membership. They are fraternal organizations in character. In case of most of the organizations, the money received from the state is in large part devoted to private organizational purposes. In every one of such organizations the reports show expenses of state headquarters paid from state appropriations. The report of the 37th Division A. E. F. Veterans’ Association recites that the entire amount received by it was spent for salaries. The record shows that the Disabled American Veterans of World War II had accumulated a $50,000 surplus from funds received from the state. The reports of the American Legion of Ohio and Veterans of Foreign Wars show an expenditure of an amount of money equal to that received from the state for the payment of salaries and expenses to employees of such organizations whose duty it is to assist veterans and their families in filing and prosecuting claims before the Veterans Administration. For the most part the reports of other organizations show that funds received were primarily spent for the general purposes of the organizations, and most of the organizations to which appropriations were made did not have any employees working at the Veterans Administration. No control was provided for by law or exercised as to how the organizations were to spend the money appropriated to them by the state. The purposes for which expenditures were made were left entirely to the organizations themselves. No audits of any kind were made or provided for, there was no audit of any kind ever attempted by state officers, and no investigation or check was made with respect to the reports filed with the board of control.
*159 The brief of the veterans organizations in the instant ease poses the question: May the General Assembly constitutionally delegate to private organizations the expenditure of public funds? It answers the inquiry in the affirmative and cites two cases, decided by this court, as supporting that answer. The first is that of State, ex rel. Leaverton, v. Kerns, Aud., 104 Ohio St., 550, 136 N. E., 217, an action in mandamus to require the auditor of Highland County to issue a warrant to the relators in the sum of $574.22 claimed to be due the Leesburg-Highland Agricultural Company under the provisions of Section 9880-1, General Code, which authorized an award of two cents for each inhabitant of the county to a nonprofit agricultural society which annually held an exhibition since 1914. The statute contained a number of specific qualifying limitations concerning the operation of the exhibition and the expenditure of the funds and required a certificate from the president of the State Board of Agriculture that the law had been complied with. This court specifically held:
“The aid provided by Section 9880-1, General Code, is not for the purpose of furnishing financial assistance to a private enterprise, nor for lending the credit of the state thereto, but, on the contrary, is in aid of a public institution designed for public instruction, the advancement of learning and the cause of agriculture, and is not in violation of Sections 4 and 6, Article VIII of the Ohio Constitution.”
The second case above referred to is that of State, ex rel. Pugh et al., Trustees, v. Sayre, Aud., 90 Ohio St., 215, 107 N. E., 512, an action in mandamus by the trustees of the Franklin County Law Library Association to compel the county officers to turn over to such association for the support of the library certain funds not arising from public taxation but from certain fines collected by the police court of the city of Columbus. This was authorized by Sections 3054 to 3058, inclusive, General Code, which made provision that such library should be accessible to all judicial officers of the courts of the county. This court specifically held:
‘ ‘ Section 6 of Article VIII of the Constitution is applicable to the taxing power of the state and designed for the protection of moneys resulting from its exercise, and it does not prohibit *160 the devotion of ‘fines and penalties assessed and collected by the police court for offenses and misdemeanors prosecuted in the name of the state’ to the aid of a law library association, whose library is subject to use by all officers exercising judicial functions in the county in which such police court sits such library being a corporation not for profit.”
Those two cases are to be distinguished from the case at bar in three vital respects:
1. The appropriation of the funds in each case was authorized by specific legislation.
2. The recipients of the funds received them not for the use and benefit of their own members but for the benefit of the public at large.
3. The funds appropriated and received were in fact in payment for services rendered directly to the public by the recipients.
Heretofore, in providing aid to the soldiers of the state, the General Assembly of Ohio has always regarded as necessary legislation to authorize the appropriation of public funds for that purpose and to provide for the distribution of such funds through governmental channels. The General Assembly through the enactment of Section 517.30, Eevised Code, has provided that “whenever there is presented to the Board of Township Trustees, a petition signed by not less than 30 per cent of the electors of such township as shown by the last preceding general election held therein, requesting the erection of a suitable monument to commemorate the soldiers and sailors who died in the service of the United States or of this state, such board may, by a majority vote, appropriate and expend not more than 500 dollars from the township funds for the purpose of erecting such monument, according to plans and specifications furnished or approved by such board. ’ ’
Sections 345.01 to 345.18, inclusive, Eevised Code, provide a plan whereby the council of a municipality, the trustees of a township or the county commissioners of a county may purchase a site and erect and equip a memorial building to commemorate the services of all members and veterans of the armed forces of the United States, levy a tax for the purposes of such acquisition and construction, appoint a board of trus *161 tees to control and operate the memorial for the benefit of the people of the entire territorial unit “for community, civic and patriotic purposes,” and permit its occupancy by any society or association of soldiers or any historical society with or without rental.
By the authority of the General Assembly, Ohio has a system of veterans relief administered by a governmental body for each county, known as the Soldiers ’ .Relief Commission appointed by a judge of the Common Pleas Court of the county. See Sections 5901.01 to 5901.99, inclusive, Revised Code. Under this act it is the duty of the commission to ascertain the needs of indigent soldiers and members of their families, and the county commissioners are required to make a tax levy not to exceed five-tenths of a mill per dollar to provide funds for such relief. The act requires that the names of persons receiving such relief and the amounts thereof be listed as a public record. The act provides also for the burial of indigent soldiers and for the care of cemeteries and the graves of such soldiers.
By Sections 5913.18 to 5913.99, inclusive, Revised Code, there is established a state department of soldiers’ claims under the supervision of the Adjutant General of the state. It is managed and supervised by a state commissioner of soldiers claims appointed by the Governor. It is his duty to “furnish necessary instructions and advice to the soldiers, sailors, and marines of the state, their heirs or legal representatives, respecting their claims against the United States for pensions, bounty, back pay or otherwise, by reason of military or naval service, assist in the collection of such claims, and perform such other duties pertaining to his office as the Adjutant General requires. ’ ’
In almost every case where the question of the authority to appropriate public funds to the use and benefit of war veterans is involved the question of the constitutionality of the legislation purporting to authorize the appropriation of such funds is the issue before the court. In all such cases in which such legislation was upheld the statutes specified the purposes for which such public funds shall be used and specifically set out the limitations on such use. Here, there is no authorizing legis *162 lation for the appropriations as there is in every other instance where public funds are authorized to be used for the benefit of the soldiery of the state, as above pointed out.
After a somewhat diligent search, I believe no case can be found approving the principles approved by the majority opinion and the judgment in this case, where appropriations of public funds are made direct to concededly private corporations or organizations, and not through governmental channels, for the exclusive use and benefit of their soldier members or the exclusive use and benefit of certain other soldiers whom they select. It is my view that the overwhelming weight of judicial authority is to the contrary. Under the circumstances of the instant case, the funds were not appropriated for administration by a public authority, nor are they being devoted to a public use.
On two former occasions the people of Ohio have amended its Constitution to provide for soldiers bonuses. In the first instance, the Constitution was amended to permit the expenditure of $25,000,000 from public tax funds for the payment of bonuses to soldiers of World War I. The Constitution was amended the second time to authorize the issue of bonds in the sum of $300,000,000, payable out of tax funds, for bonuses to World War II veterans, and the present General Assembly is submitting to the people a constitutional amendment to provide funds for bonuses for soldiers of the Korean operation, all to be administered through state governmental channels.
If constitutional amendments are necessary to authorize the payment of such bonuses, certainly the funds here in question can not be lawfully distributed without either a constitutional amendment or an authorizing legislative act with such limitations as will bring such distribution within constitutional requirements.
Weygandt, C. J., and Griffith, J., concur in the foregoing dissenting opinion.